IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>NUKILL T. TAYLOR,<br><br>    Defendant. | Case No. 3:24-CR-30015-NJR-1 |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

On February 21, 2024, Nukill Taylor was indicted by a federal grand jury on one count of being a Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). (Doc. 1). The indictment alleges that on or about December 19, 2023, Taylor "knowingly possessed a firearm . . . having previously been convicted of a crime punishable by imprisonment for a term exceeding one year." *Id.* Taylor now moves to dismiss the indictment (Doc. 17), arguing that section 922(g)(1) violates the Second Amendment in light of the United States Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

LEGAL STANDARD

Federal Rule of Criminal Procedure 12(b)(1) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Rule 12 authorizes defendants to challenge the lawfulness of a prosecution on purely legal, as opposed to factual, grounds. *See United States v. Coscia*,

866 F.3d 782, 790 (7th Cir. 2017) (considering defendant's contention that the indictment must be dismissed because the statute under which it is brought is unconstitutionally vague). A court may decide all questions of law raised in a motion to dismiss, including the constitutionality and interpretation of a federal statute. *See United States v. Sorich*, 523 F.3d 702, 706 (7th Cir. 2008).

A constitutional challenge to a statute can be brought as either a facial challenge or an as-applied challenge. *United States v. Stork*, No. 2:21-CR-7 JD, 2024 WL 2955735, at *2 (N.D. Ind. June 12, 2024). To succeed on an as-applied challenge, as Taylor raises here, the moving party must show the statute is unconstitutional because of the way it was applied to the particular facts of their case. *See United States v. Phillips*, 645 F.3d 859, 863 (7th Cir. 2011).

## Discussion

The Second Amendment to the U.S. Constitution guarantees the right of the people to keep and bear arms. *Dist. of Columbia v. Heller*, 554 U.S. 570, 635 (2008). At the same time, 18 U.S.C. § 922(g)(1) criminalizes the possession of a firearm by any person who has been convicted of a crime punishable by imprisonment for a term exceeding one year. Taylor argues that the Second Amendment protects his right to bear arms and that § 922(g)(1) is unconstitutional as applied to him.

The Supreme Court has held that the right to keep and bear arms is among the "fundamental rights necessary to our system of ordered liberty." *United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024) (quoting *McDonald v. Chicago*, 561 U.S. 742, 778 (2010)). "Like most rights," though, "the right secured by the Second Amendment is not unlimited." *Id.*

(quoting *Heller*, 554 U.S. at 626); *see also Bevis v. City of Naperville, Ill.*, 85 F.4th 1175, 1181 (7th Cir. 2023) (recognizing that "even the most important personal freedoms have their limits").

The test for analyzing the constitutionality of firearm restrictions is provided by *Bruen*. 597 U.S. at 24. Under *Bruen*, a court must first determine whether the "Second Amendment's plain text covers an individual's conduct." 597 U.S. at 24. If it does, the Constitution presumptively protects that conduct and the burden shifts to the government to demonstrate that the regulation "is consistent with this Nation's historical tradition of firearm regulation." *Id.* To determine whether a challenged law is consistent with the Nation's regulatory tradition, courts "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29).

Courts also must examine "[w]hy and how the regulation burdens the right." *Id.* "[I]f laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* But even if the reason for the regulation is permissible, the law "may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Id.* "And when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id.* (quoting *Bruen*, 597 U.S. at 30). Although *Rahimi* addressed section 922(g)(8), which bars individuals subject to restraining orders

from possessing guns in the home, the Supreme Court reiterated its holding in *Heller* that many such prohibitions, like those on the possession of firearms by "felons and the mentally ill" are "presumptively lawful." *Id.* at 699 (quoting *Heller*, 554 U.S. at 626, 627, n.26).

Here, Taylor contends that the permanent disarmament of felons cannot be squared with the Second Amendment under *Bruen*. He cites historical examples of criminals being armed for specific purposes—*e.g.*, fighting in the Revolutionary War and the War of 1812, and to suppress riots—as well as Founding-era firearms regulations that disarmed individuals based on their political persuasions, as opposed to their criminal backgrounds. From this historical record, Taylor contends that felon disarmament is not part of the Nation's historical tradition of firearm regulation. The Government disagrees, citing numerous regulatory analogues from pre-Colonial England through the Reconstruction Era in the United States as examples of legislative authority to disarm convicted felons.

*Heller* itself could be read to foreclose Taylor's argument out of the gate. There, the Supreme Court expressly acknowledged the "longstanding prohibitions on the possession of firearms *by felons* and the mentally ill." *Heller*, 554 U.S. at 626 (emphasis added); *see also United States v. Williams*, 113 F.4th 637, 643 (6th Cir. 2024) (recognizing section 922(g)(1) as "presumptively lawful" under *Heller*). It is thus not surprising that *Heller* associated the right to bear arms with "law-abiding" citizens. *Id.* at 625. And, when describing people who possess rights under the Second Amendment, *Bruen* repeatedly used the phrase "law-abiding, responsible citizens." *Bruen*, 597 U.S. at 26. But neither case

specifically held that the plain text of the Second Amendment does not apply to felons. *See Williams*, 113 F.4th at 649 ("Nothing in the Second Amendment's text draws a distinction among the political community between felons and non-felons"). As a result, district courts in this Circuit are split on the issue of whether the Second Amendment protects a felon's right to keep and bear arms. *See United States v. Stringer*, No. 23-CR-20003, 2024 WL 3609058, at *9 (C.D. Ill. July 30, 2024) (recognizing split in authorities); *United States v. Khiry Jackson*, 2023 WL 7160921, at *2-3 (N.D. Ill. Oct. 31, 2023) (collecting cases). Due to the lack of clear guidance or controlling authority, this Court will assume, without deciding, that felons are among "the people" protected by the Second Amendment and will proceed to the second step proscribed by *Bruen*: whether section 922(g)(1)'s disarmament of felons "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

In *Atkinson v. Garland*, the Seventh Circuit directed district courts to consider five questions when analyzing whether a statute is part of this country's historical tradition of firearm regulation. *Atkinson v. Garland*, 70 F.4th 1018, 1023-24 (7th Cir. 2023). In summary, this Court must ask: (1) Does section 922(g)(1) address a "general societal problem that has persisted since the 18th century?" (2) What does history tell us about disarming those convicted of crimes generally and of felonies in particular? (3) Are there broader historical analogues to section 922(g)(1) during the periods that *Bruen* emphasized, including, but not limited to, laws disarming "dangerous" groups other than felons? (4) If there are analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated instances of regulation) to support section 922(g)(1)? and

(5) If individualized assessments for a distinction between violent and non-violent felonies are appropriate, how should a court define a non-violent or a non-dangerous felony—and what evidence can a court consider in assessing whether a particular felony conviction was violent? *Id.*

Taylor's motion follows the *Atkinson* framework. It cites several secondary sources that, according to him, place section 922(g)(1) outside of the Nation's "historical tradition of firearm regulation." But the Government has answered *Atkinson*'s questions as well and in far greater detail. The Court thus adopts the Government's well-reasoned and well-researched historical analysis. (*See* Doc. 22).[1]

First, Section 922(g)(1) addresses a "general societal problem that has persisted since the 18th century" in that it disarms people who, like felons, are untrustworthy adherents to the rule of law. The historical record discussed by the Government demonstrates that legislatures historically have had wide latitude to exclude felons from exercising certain rights, including the right to bear arms, as a consequence of their convictions. *See* Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868); *see also United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam) ("[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous

---

[1] Because the "history and tradition" test necessarily involves a critical examination of historical authorities, "[c]ourts are . . . entitled to decide a case based on the historical record compiled by the parties." *Bruen*, 597 U.S. at 25 n.6.

citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'").

Second, by the time the Second Amendment was ratified in 1791, there was an established tradition of legislatures categorically disarming groups who they feared would disregard the law. These regulations prioritized social order and respect for the law over a preexisting right to self-defense. *See Atkinson*, 70 F.4th at 1034 (Wood, J., dissenting) ("During the American Revolution, several states passed laws providing for the confiscation of weapons owned by persons who refused to swear an oath of allegiance to the state or to the United States."). Furthermore, there were no meaningful Founding-era disputes regarding the lawfulness of disarming criminals, and throughout early American history, convicted felons were subject to estate forfeiture and even capital punishment for non-violent felonies. If a felon could potentially be subject to the death penalty or forfeiture of their entire estate as punishment for even a non-violent offense, then certain disarmament would have been an accepted punishment.

Third, this country has a tradition of disarming dangerous persons other than felons. For example, in *Rahimi*, the Supreme Court held that an individual subject to a restraining order, *e.g.*, one who poses a credible threat to the physical safety of another, may be temporarily disarmed consistent with the Second Amendment. 602 U.S. at 700.

Fourth, these historical analogues are sufficiently similar to section 922(g)(1) and are not "isolated instances of regulation." Section 922(g)(1)'s prohibition on firearm possession is comparable to, and is certainly not greater than, the punishment inflicted on criminals at the founding, which included deprivation of their entire estate or even death. *See Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) (explaining that "it is

difficult to conclude that the public, in 1791, would have understood someone facing death . . . to be within the scope of those entitled to possess arms").

Having examined the factors provided by *Atkinson*, the Court concludes that section 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation and thus constitutional. *See Williams*, 113 F.4th at 662-63 (extensive historical analysis under *Bruen* supported constitutionality of section 922(g)(1)). Taylor also argues, however, that the statute is nevertheless unconstitutional as applied to him.

In *United States v. Gay*, the Seventh Circuit assumed without deciding "for the sake of argument that there is *some* room for as-applied challenges" by non-violent offenders to section 922(g)(1). *United States v. Gay*, 98 F.4th 843, 846 (7th Cir. 2024), *reh'g denied*, No. 23-2097, 2024 WL 3816648 (7th Cir. Aug. 14, 2024).[2] Citing *Bruen*, the Seventh Circuit noted that the Supreme Court repeatedly used the phrase "law-abiding, responsible citizens" when describing people who possess rights under the Second Amendment. *Id.* (quoting *Bruen*, 597 U.S. at 26). The defendant in *Gay* did not fit that description, having been convicted of 22 felonies, including aggravated battery of a peace officer and possession of a weapon while in prison. *Id.* at 846-47. Gay also possessed the weapon

---

[2] In *Gay*, the Seventh Circuit sidestepped the question of whether §922(g)(1) is constitutional, while at the same time finding the defendant's argument that the Second Amendment permits felons to possess firearms notwithstanding § 922(g)(1) "hard to square" with the Supreme Court's statement in *Heller* that "longstanding prohibitions on the possession of firearms by felons" are valid. *Id. (*quoting *Heller*, 554 U.S. at 626, 635). Some courts in this circuit have since interpreted *Gay* as foreclosing facial challenges to § 922(g)(1). *See, e.g., United States v. Montgomery*, No. 23-CR-00623, 2024 WL 4240759, at *1 (N.D. Ill. Sept. 19, 2024); *United States v. Barenas-Reynoso*, No. 19-CR-00351-8, 2024 WL 3509757, at *2 (N.D. Ill. July 23, 2024).

while on parole for his prior felony. *Id.* at 847. The Seventh Circuit emphasized that parole is a form of custody before holding that "parolees lack the same armament rights as free persons." *Id.* The court then concluded that Gay was not a "'law-abiding, responsible' person who has a constitutional right to possess firearms" and rejected his as-applied challenge to the constitutionality of section 922(g)(1). *Id.*

Under *Gay*, the nature of the defendant's criminal history and conduct for which he had been indicted was fatal to his as-applied challenge. *Id.* at 846-47. To find that section 922(g)(1) was unconstitutional as applied to Gay, the court explained, would trample *Heller* and *Bruen*'s repeated acknowledgments that the Second Amendment grants rights to "law-abiding, responsible citizens." *Id.* at 846-47. So too here. At the time of Taylor's arrest for the instant offense, he had a criminal history that included multiple burglary convictions and a separate conviction for being a felon in possession of a firearm under section 922(g)(1). It is thus apparent that Taylor, like the defendant in *Gay*, "is not a "law-abiding, responsible" person who has a constitutional right to possess firearms." *Id.* at 847. Thus, section 922(g)(1) is constitutional as applied to Taylor.

Taylor's final argument posits that the criminalization of his alleged possession of a firearm violates his equal protection rights under the Fifth Amendment. This argument does not appear to be fully developed because it is raised at the end of Taylor's motion to dismiss and then seemingly omitted from his supporting memorandum of law. *See United States v. Williams*, 85 F.4th 844, 849 (7th Cir. 2023) (discussing waiver of undeveloped arguments). Moreover, the only pertinent authority Taylor cites in support of this argument is a comment from Judge Wood's dissent in *Atkinson*. There, Judge

Wood found that certain historical firearms regulations, including loyalty oaths and disarmament regimes targeting political opponents or Native American tribes, were evidence of "the scope of governmental power that was understood to exist at the time the Second Amendment was adopted." *Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting). Judge Wood offered the following observation about such laws:

> Though some of those laws would no longer pass muster under the Equal Protection Clause, they reveal conclusively the scope of governmental power that was understood to exist at the time the Second Amendment was adopted. This power allowed the creation of categorical restrictions without any case-by-case escape hatch. Section 922(g)(1) does precisely what statutes have been doing since the mid-18th century. It identifies the group of persons deemed dangerous to the political community—those convicted of the defined felonies—and it makes it unlawful for them to possess a firearm. *To the extent people in that group want to contest the suitability of the dangerousness label to their situation, that is once again an equal protection argument and not an argument about the scope of government authority under the Second Amendment.*

*Id.* (emphasis added).

Taylor seizes on the italicized portion above to argue that an equal protection challenge to section 922(g)(1) may be "tenable" in the Seventh Circuit. (Doc. 17 at 3). At the same time, Taylor acknowledges that Judge Wood's dissent does not alter "the Seventh Circuit's consistent rejection of equal protection challenges to 18 U.S.C. § 922(g)(1)." *Id.* Taylor is correct that the law of the Seventh Circuit is unchanged on this issue. *See United States v. Wilson*, 118 F. App'x 974, 977 (7th Cir. Dec. 6, 2004) (holding that section 922(g)(1) does not violate Fifth Amendment's Equal Protection Clause).

At most, Judge Wood's comment distinguishes between two issues. On the one hand, she found that the Nation's historical tradition of firearm regulation includes the

legislative prerogative to create "categorical restrictions" on gun possession by "dangerous" individuals as section 922(g)(1) does. *Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting). This is the constitutional inquiry demanded by *Bruen*. On the other hand, she explains that any person wanting to "contest the suitability of the dangerousness label" would have to bring such a claim under the Equal Protection Clause of the Fifth Amendment. *Id.* at 1035-36. But nothing in Judge Wood's dissent suggests that the Seventh Circuit has reconsidered what Taylor himself called the "consistent rejection of equal protection challenges to 18 U.S.C. § 922(g)(1)."

Taylor also has not fully developed an equal protection argument; neither his motion nor his supporting memorandum of law even reach the first step of such a claim— explaining the level of scrutiny that would apply. *See Ostrowski v. Lake County*, 33 F.4th 960, 966 (7th Cir. 2022) ("When state action discriminates against a suspect class or denies a fundamental right, courts apply strict scrutiny."); *Lopez Ramos v. Barr*, 942 F.3d 376 (7th Cir. 2019) ("When no suspect class or fundamental right is involved, we employ a rational basis test to determine whether the legislative act is constitutional") (quoting *Eby-Brown Co., LLC v. Wisconsin Dep't of Agric.*, 295 F.3d 749, 754 (7th Cir. 2002)). And because Taylor has not provided the necessary legal analysis to support an equal protection argument (other than to say that he would be "remiss in ignoring the possibility of an equal protection challenge" in light of Judge Wood's dissent), there is no reason to examine the issue further.

## Conclusion

For these reasons, the Court finds that section 922(g)(1) does not violate the Second

Amendment as applied to Defendant Nukill T. Taylor. Taylor's Motion to Dismiss the Indictment (Doc. 17) is **DENIED**.

    **IT IS SO ORDERED.**

    DATED:  **January 23, 2025**

                                                                **NANCY J. ROSENSTENGEL**
                                                                **Chief U.S. District Judge**